Quarles & Brady LLP
Firm State Bar No 00443100.
Renaissance One
Two North Central Avenue
Phoenix, Arizona 85004-2391
TELEPHONE 602.229.5200

*Attorneys for Compass Bank*

Brian Sirower (#12354)
Brian.sirower@quarles.com
James L. Ugalde (#22733)
Jim.ugalde@quarles.com

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>WILLOW CREEK PARTNERS, LLC<br>JOY LANE, LLC<br><br>Debtors. | Chapter 11 Proceedings<br><br>Case No. 2:11-bk-6060-RTBP<br>Case No. 2:11-bk-6062-RTBP<br><br>Joint Administration Under<br>Case No. 2:11-bk-6060-RTBP |
| This filing applies to:<br><br>☒ All Debtors<br><br>☐ Specified Debtors | **COMPASS BANK'S EXPEDITED MOTION TO DISMISS OR CONVERT CHAPTER 11 CASES TO CHAPTER 7** |

This Motion is filed by COMPASS BANK ("Compass"), a secured creditor and party-in-interest in the above-captioned Chapter 11 cases of WILLOW CREEK PARTNERS, LLC ("Willow Creek") and JOY LANE, LLC ("Joy Lane," and together with Willow Creek, the "Debtors"). Pursuant to this Motion, Compass requests that the Court dismiss or convert the Debtors' Chapter 11 cases to Chapter 7 because they were commenced in bad faith and serve no legitimate Chapter 11 purpose. This Motion is supported by the attached Memorandum of Points and Authorities and the entire record before the Court in these Chapter 11 cases.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. **INTRODUCTION.**

These Chapter 11 cases were orchestrated by non-debtor parties that have personally guaranteed the Debtors' obligations to Compass, commenced to obtain a tactical advantage in pending state court litigation involving those parties and should be dismissed or converted to Chapter 7. The Debtors each are single purpose limited liability companies that respectively exist only to hold a single parcel of unimproved real property acquired with loans extended by Compass. The Debtors' obligations to Compass are secured by, among other things, the two properties acquired by the Debtors and personal guaranties from non-debtor individuals and affiliates (collectively, the "<u>Guarantors</u>") pursuant to which they each guaranteed the full payment of all amounts owed by the Debtors to Compass (collectively, the "<u>Guaranties</u>"). The Guarantors include the individual members and controlling equity holders of the Debtors. On information and belief, the Guarantors are solvent and fully capable of satisfying their obligations to Compass in full.

After the Debtors defaulted on their obligations to Compass by failing to repay the loans upon their respective maturities, Compass commenced litigation in state court against the Guarantors seeking to recover the amounts they owed to Compass under the Guaranties. Although the Guarantors had individually agreed to pay all amounts owed by the Debtors, it soon became clear that they had no intention of honoring their obligations to Compass - even though they have adequate financial resources to do so - and that the Guarantors would seek to manipulate Chapter 11 cases involving the Debtors to avoid those personal debts. Throughout the course of the state court litigation, the Guarantors and the Debtors repeatedly threatened that, if Compass did not release the Guarantors of their liability under the Guaranties, they would cause the Debtors to file Chapter 11 cases and propose liquidating plans compelling Compass to accept the properties in satisfaction of those personal obligations.

These threats were realized when the Guarantors directed the Debtors to

commence these Chapter 11 cases. As evidenced by their plans of liquidation, the Debtors do not intend to reorganize (which is not surprising because they have no business activities, no going concern value to preserve, no affairs to wind down and no meaningful assets except for the properties that are encumbered by Compass' loans). Remarkably, the Debtors also do not intend to use the Chapter 11 process to effectuate an actual liquidation. The Debtors have only four putative secured creditors and no identified unsecured creditors. Instead of selling assets and distributing the proceeds under the plans, the Debtors will satisfy the claims of these secured creditors by either abandoning and returning their collateral or redistributing limited funds that are to be contributed by the Debtors' equity holders. Of course, the Debtors do not need to employ Chapter 11 or confirm a plan to dispose of their assets in this manner or redistribute funds provided by their equity holders. However, that is not the purpose of these bankruptcy cases, which has been made clear by the prepetition threats of the Guarantors and one curious provision of the plans.

Specifically, even though the Debtors intend to forfeit any interest in the properties securing Compass' loans without regard to their worth, the Debtors will be required to litigate the value of the properties. Indeed, conducting this litigation seems to be the only substantial responsibility of the Debtors under the plans. Yet, given the terms of the proposed liquidation and the availability of alternative state law procedures to dispose of the properties, the Debtors and their estates have no apparent interest in the outcome of any valuation dispute. In fact, it would be far more efficient and far less costly for the Debtors to simply abandon the properties to Compass outside of a plan and grant relief from stay so that Compass may seek to exercise its state law remedies, a course of action to which the Debtors have steadfastly refused to consent.

In light of these circumstances, it is reasonable to ask why the Debtors have even sought Chapter 11 relief and proposed plans obligating them to litigate the value of assets that will be forfeited to secured creditors and in which they have no interest. The answer to this question is evident: because the Guarantors believe that they can use a favorable valuation determination by this Court against Compass in the pending state court litigation to limit their personal liability under

the Guaranties. In substance, the Guarantors are using the Debtors as proxies to litigate the value of the properties in this Court on their behalf, funding the expenses of the Debtors' Chapter 11 cases and the plans as the cost of implementing this scheme. These are not legitimate purposes for the Chapter 11 process and this Court is not the proper forum to adjudicate disputes that are fundamentally between Compass and the Guarantors. Consequently, the Debtors' Chapter 11 cases lack good faith and should be dismissed or converted to Chapter 7.[1]

II. **BACKGROUND.**

**Formation of the Debtors as Single Purpose Real Estate Holding Companies**

1. Willow Creek is an Arizona limited liability company that was formed in 2003 for the sole purpose of purchasing and developing a single parcel of unimproved real estate, which is located at 905 Flora Street, Prescott, Arizona (the "Willow Creek Property").

2. Joy Lane is an Arizona limited liability company that was formed in 2008 for the sole purpose of purchasing and developing a single parcel of unimproved real estate, which is located at 5000 South Highway 95, Fort Mohave, Arizona (the "Joy Lane Property," and together with the Willow Creek Property, the "Properties").

3. Willow Creek and Joy Lane exist solely as real estate holding companies. Willow Creek and Joy Lane conduct no business activities, have no employees and the Properties are their only meaningful assets. See *Summary of Schedules* [Case No. 2:11-bk-6060-RTBP at Docket No. 25]; *Summary of Schedules* [Case No. 2:11-bk-6062-RTBP at Docket No. 20].

4. In addition to having similar limited purposes, Willow Creek and Joy Lane share overlapping members and owners. The members of Willow Creek are John J. Gisi and Jason J. Gisi. The members of Joy Lane are John J. Gisi, Jason J. Gisi and Jason C. Rowley.

---

[1] Arguably, the Debtors' Chapter 11 cases were commenced as "test cases" to determine whether the jurisdiction of this Court can be stretched to accommodate the interests of non-debtors through the use of a bankruptcy forum without any related bankruptcy purpose.

### Compass' Secured Loans and the Guarantor Obligations

5.     On or about June 18, 2008, Compass made a loan to Joy Lane in the original principal amount of $1,690,000.00 (the "<u>Joy Lane Loan</u>") to purchase the Joy Lane Property. The Joy Lane Loan is evidenced by, among other things, that certain Promissory Note (the "<u>Joy Lane Note</u>") dated June 18, 2008, executed by Joy Lane and delivered to Compass in the original principal amount of $1,690,000.00. The Joy Lane Note is secured by, among other things, the Joy Lane Property and has a maturity date of June 18, 2010.

6.     On or about July 25, 2008, Compass made a loan to Willow Creek in the original principal amount of $2,340,000.00 (the "<u>Willow Creek Loan</u>," and together with the Joy Lane Loan, the "<u>Loans</u>") to purchase the Willow Creek Property. The Willow Creek Loan is evidenced by, among other things, that certain Promissory Note (the "<u>Willow Creek Note</u>") dated July 25, 2008, executed by Willow Creek and delivered to Compass in the original principal amount of $2,340,000.00. The Willow Creek Note is secured by, among other things, the Willow Creek Property and has a maturity date of July 25, 2010.

7.     The Debtors' obligations to Compass are also secured by personal guaranties from the members and controlling equity holders of Joy Lane (John J. Gisi, Jason J. Gisi and Jason C. Rowley) and Willow Creek (John J. Gisi and Jason J. Gisi) and certain related individuals and affiliates pursuant to which they each guaranteed the full payment of the Loans and all amounts owed by the Debtors to Compass.

8.     Compass believes that the Guarantors have more than adequate financial resources to satisfy their personal obligations to Compass under the Guaranties.

### Prepetition Defaults and State Court Litigation Against the Guarantors

9.     On June 18, 2010, the Joy Lane Loan fully matured according to its terms, and on July 25, 2010, the Willow Creek Loan fully matured according to its terms. Following the maturity of the loans, Joy Lane and Willow Creek defaulted on their obligations by failing to pay any of the amounts to Compass, which remain fully outstanding.

10. After the loans matured, Compass attempted to reach a consensual resolution of the undisputed and full matured debts with Joy Lane, Willow Creek and the Guarantors. Notwithstanding the efforts of Compass, the parties were unable to finalize any agreement providing for the satisfactory resolution of the obligations owed to Compass.

11. As a result, on September 17, 2010, Compass filed two complaints against the Guarantors in Maricopa County Superior Court for the State of Arizona (the "State Court") to enforce their obligations under the Guaranties, commencing Case Nos. CV2010-027458 and CV2010-027457, which were subsequently consolidated as Case No. CV2010-027457 (the consolidated state court proceedings are referred to herein as the "State Court Guaranty Action").

12. Although Compass had elected not to include Joy Lane or Willow Creek as defendants in the State Court Guaranty Action, and the Guarantors had expressly waived any right to require Compass to enforce any rights against Joy Lane or Willow Creek, the Guarantors eventually made written demand that Compass join both Joy Lane and Willow Creek as defendants in the litigation.

13. In response to Guarantors' demand, and to avoid disputes and potential delay, Compass entered into a stipulation with the Guarantors requesting that the State Court grant leave to Compass to file an amended complaint adding the Debtors as defendants. The stipulation between Compass and the Guarantors was granted by the State Court on March 4, 2011. The order granting the stipulation required Compass to file an amended complaint by March 14, 2011. As explained below, the Guarantors caused the Debtors to file voluntary Chapter 11 bankruptcy petitions before Compass could file the amended complaint.[2]

---

[2] The Guarantors include the members and controlling equity holders of Joy Lane and Willow Creek, which have sole authority to direct Joy Lane and Willow Creek to file voluntary bankruptcy petitions.

**The Guarantors Orchestrate the Debtors' Bankruptcy Cases**

14. Throughout the course of the State Court Guaranty Action, the Debtors and the Guarantors repeatedly threatened to cause Joy Lane and Willow Creek to commence Chapter 11 cases in an effort to coerce Compass into discharging the Guarantors' personal liabilities in exchange for the Properties. These threats commonly indicated that, if Compass did not capitulate to the Guarantors' demands, the Guarantors would use the Chapter 11 cases of Joy Lane and Willow Creek to propose plans that forced Compass to accept the Properties, thereby purportedly satisfying the Guarantors' personal obligations to Compass.

15. On March 10, 2011, nearly six months after the State Court Guaranty Action was commenced and immediately before Compass could file the amended complaint, the Guarantors followed through with their threats to manipulate the Chapter 11 process for their own personal benefit by directing Joy Lane and Willow Creek to commence these bankruptcy cases.[3]

16. Contemporaneous with the filing of their bankruptcy petitions, both of the Debtors submitted substantially identical plans of liquidation. See *Debtor's Liquidating Plan of Reorganization Dated March 10, 2011* [Case No. 2:11-bk-6060-RTBP at Docket No. 7] (the "Willow Creek Plan"); *Debtor's Liquidating Plan of Reorganization Dated March 10, 2011* [Case No. 2:11-bk-6062-RTBP at Docket No. 7] (the "Joy Lane Plan," and together with the Willow Creek Plan, the "Plans").

17. The Debtors' duties under the Plans are limited and largely ministerial. Reflecting their status as real estate holding companies, the Debtors have no going concern value to preserve,

---

[3] The Guarantors have also asserted that Compass is prohibited from pursuing any claims against the Guarantors unless the amended complaint is filed and Debtors are joined as defendants in the State Court Guaranty Action. Compass has requested limited relief from stay solely to permit Compass to file an amended complaint in the State Court Guaranty Action joining the Debtors as additional defendants in the litigation. See *Compass Bank's Expedited Motion For Relief From the Automatic Stay to File Amended Complaint In State Court Guaranty Action* [Case No. 2:11-bk-6060-RTBP at Docket No. 30]. Compass does not concede that it is precluded from seeking relief against the Guarantors in the absence of joining the Debtors as defendants in the State Court Guaranty Action.

no affairs to wind down and no meaningful assets except for the Properties. The Debtors have no identified unsecured creditors and only three putative secured creditors besides Compass, each of which the Debtors indicate are fully secured.[4] The Debtors do not intend to reorganize, and rather than liquidating any assets and distributing the proceeds to creditors, they propose to satisfy these claims through two methods, neither of which requires involvement of the Chapter 11 process or the jurisdiction of this Court to be accomplished.

18. The Debtors will satisfy certain classes of secured claims and unsecured claims through nominal payments funded entirely from contributions made by the Debtors' equity holders, essentially redistributing those amounts and acting as disbursing agents on behalf of the equity holders. See Plans at §§ IV.B.3., IV.B.4. and IV.C. In the alternative, the Debtors will satisfy other classes of secured claims by simply abandoning and returning the collateral to the secured creditors. Id. at §§ IV.B.1. and IV.B.2. The treatment of Compass' secured claims falls into this latter category, with one significant distinction that is not applicable to any other creditor.

19. Although the Debtors also propose to satisfy Compass' secured claims by forfeiting any interest in the Properties to Compass *irrespective* of their worth, the Debtors will nonetheless be obligated to litigate the value of the Properties in this Court. See Plans at § IV.B.1. The ostensible purpose of the valuation litigation is to determine whether Compass will hold unsecured deficiency claims, which will be "deemed satisfied in full" through pro rata distributions of up to $50,000 that will also be funded by the Debtors' equity holders. Id. at §§ IV.B.1, IV.C.

---

[4] Because the Debtors are real estate holding companies that conduct no business activities, it is reasonable to expect that any legitimate claims against them arise from ownership of the Properties, such as the secured claims that have been scheduled for taxing authorities and Compass. See *Summary of Schedules* [Case No. 2:11-bk-6060-RTBP at Docket No. 25]; *Summary of Schedules* [Case No. 2:11-bk-6062-RTBP at Docket No. 20]. Consistent with their contrived bankruptcy strategy, the Debtors allege to have incurred two other secured claims related to nominal services and equipment that were allegedly provided in October 2010 - the same time the Debtors were threatening to file for bankruptcy if Compass did not take back the Properties and release the Guarantors. Id. The Debtors would not incur these debts for genuine business purposes while actively preparing to dissolve.

1    20.  The Plans also broadly and permanently enjoin creditors from "commencing or continuing any action, in any manner, in any place, that does not comply with or is inconsistent with the provisions of [the] Plan," even if the action involves only the enforcement of their rights against non-debtor third parties, such as the pursuit of Compass' claims against the Guarantors. Id. at § VI.

21.  Similarly, the Plans will enjoin creditors from pursuing any "claims arising, or related to, any act or omission" occurring after the petition date against a wide array of non-debtor third parties that consist of "[the Debtors'] current and former officers, directors, employees, agents, brokers, advisors, shareholders, representatives, and professionals and their affiliates, heirs, assigns, and successors" unless those claims are "brought in, and adjudicated by," this Court. Id.

III. **LEGAL ARGUMENT.**

    A. **Legal Standard for Dismissal or Conversion of Chapter 11 Case.**

The Court may dismiss or convert a Chapter 11 case, whichever is in the best interest of creditors, for cause. See 11 U.S.C. § 1112(b) (2005). Bankruptcy Code § 1112(b) lists sixteen illustrative examples of cause to dismiss or convert a Chapter 11 case. See e.g. In re AdBrite Corp., 290 B.R. 209, 217 (Bankr. S.D.N.Y. 2003) (explaining that factors set forth in Bankruptcy Code § 1112(b) constituting "cause" to dismiss or convert Chapter 11 case are "illustrative, not exhaustive").

Notably, the specific examples of "cause" set forth in Bankruptcy Code § 1112(b) are non-exclusive, and a bankruptcy court retains broad discretion to identify any factors that are relevant and appropriate under the circumstances and warrant dismissal or conversion of a Chapter 11 case for "cause." See In re Kent, 2008 WL 5047799, at *4 (Bankr. D. Ariz. 2008) (bankruptcy court has broad discretion in determining factors demonstrating cause for dismissal or conversion of Chapter 11 case) (citing In re Consolidated Pioneer Mortg. Entities, 248 B.R. 368 (B.A.P. 9th Cir. 2000)).

Once the moving party demonstrates cause to dismiss or convert a Chapter 11 case, the court *must* order dismissal or conversion unless the debtor shows the existence of "unusual

circumstances establishing that conversion is not in the best interest of the creditors and the estate" See 11 U.S.C. §1112(b)(1)-(2).

### B. The Debtors' Chapter 11 Cases Were Commenced in Bad Faith and Should Be Dismissed or Converted.

It is well established that a lack of good faith in filing a Chapter 11 petition constitutes sufficient cause for dismissal or conversion. See e.g. Marsch v. Marsch (In re Marsch), 36 F.3d 825, 828 (9th Cir. 1994) ("[A]lthough section 1112(b) does not explicitly require that cases be filed in 'good faith,' courts have overwhelmingly held that a lack of good faith in filing a Chapter 11 petition establishes cause for dismissal"); St. Paul Self Storage Ltd. P'ship v. Port Auth. of City of St. Paul (In re St. Paul Self Storage Ltd. P'ship), 185 B.R. 580, 582 (B.A.P. 9th Cir. 1995) (same); In re Liberate Techs., 314 B.R. 206, 211 (Bankr. N.D. Cal. 2004) ("To prevent abuse of Chapter 11, courts have implied the requirement that the petition be filed in good faith.").

In order to determine whether a Chapter 11 case has been commenced in good faith, the totality of the circumstances must be examined. See e.g. Marsch, 36 F.3d at 828; Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.), 779 F.2d 1068, 1073 (5th Cir. 1986) ("Findings of lack of good faith . . . have been predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than on any single datum."); Marshall v. Marshall (In re Marshall), 403 B.R. 668, 690 (C.D. Cal. 2009) ("The determination of whether a chapter 11 case was filed in good faith 'depends on an amalgam of factors and not upon a specific fact.'" (quoting Marsch, 36 F.3d at 828)); St. Paul Self Storage, 185 B.R. at 582-83; Liberate Techs., 314 B.R. at 211 ("Whether a petition is filed in good faith is to be determined upon consideration of all the facts and circumstances of the case.").

Although the courts may consider a variety of factors, the inquiry typically focuses on "whether a debtor is attempting to unreasonably deter and harass creditors or attempting to effect a speedy, efficient reorganization on a feasible basis." Marsch, 36 F.3d at 828 (citing In re Arnold, 806 F.2d 937, 939 (9th Cir. 1986)); see also In re Detienee Assocs. Ltd. P'ship, 342 B.R. 318, 323

(Bankr. D. Mont. 2008) ("[T]here is no particular test for determining whether a debtor has filed a petition in bad faith. Instead, the courts may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions' or, in particular, factors which evidence that the petition was filed 'to delay or frustrate the legitimate efforts of secured creditors to enforce their rights.'" (quoting Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.) 749 F.2d 670, 674 (11th Cir. 1984)).

As a result, the courts have often found a lack of good faith warranting dismissal of a Chapter 11 case in certain commonly recurring scenarios that indicate the proceeding serves no legitimate Chapter 11 purpose or has been commenced for reasons unrelated to reorganization of the debtor. See e.g. Marsch, 36 F.3d at 828 (noting that "courts have dismissed cases filed for a variety of tactical reasons unrelated to reorganization"); see also In re S. Cal. Sound. Sys., Inc. 69 B.R. 893, 900 (Bankr. S.D. Cal. 1987) ("[W]here the Court becomes convinced that the true purpose of filing a petition is other than to reorganize a financially distressed business, but to merely take advantage of one of the remedies available under the Code, dismissal is appropriate in order to protect the jurisdictional integrity of the Court").

As explained below, the totality of circumstances of the Debtors' Chapter 11 cases present multiple indicia of bad faith that the courts have regularly found warrant dismissal or conversion of a Chapter 11 proceeding.

1. **The Debtors Do Not Need Chapter 11 Relief.**

As an initial matter, the Debtors do not even need Chapter 11 relief, which is "[t]he most conspicuous element of the good faith requirement." Liberate Techs., 314 B.R.at 211 (Bankr. N.D. Cal. 2004); see also Marsch, 36 F.3d at 828. The Debtors have no business activities, no affairs to wind down, no employees, no unsecured creditors and no meaningful assets except for the Properties, and they do not intend to use the Chapter 11 process to reorganize or effectuate a restructuring. "Resort to the protection of the bankruptcy laws is not proper under these circumstances because there is no going concern to preserve, there are no employees to protect, and

there is no hope of rehabilitation." Little Creek Dev. Co., 779 F.2d at 1073.

Moreover, the Debtors do not need to employ the Chapter 11 process to conduct their proposed liquidation. The only event preceding these cases is the State Court Guaranty Action which Compass commenced solely to recover on its claims against the Guarantors. The Debtors have never faced any immediate financial pressure or reason to seek the protections afforded by the bankruptcy process or the automatic stay to conduct an orderly liquidation. Moreover, it is not necessary to use the Chapter 11 process to implement the Debtors' proposed form of liquidation, which will only involve the Debtors abandoning their limited assets and redistributing limited funds contributed by non-debtor third parties to secured creditors. These activities do not require, much less warrant, employment of the Chapter 11 process or the involvement of this Court, and they are routinely conducted outside of bankruptcy.[5]

The Debtors' equity holders obviously can make any payments to creditors without funneling those amounts through the Debtors for indirect distribution under a Chapter 11 plan. Likewise, the Debtors could easily liquidate and dispose of, and even abandon, their assets outside of a Chapter 11 plan. For instance, the Debtors could file a motion to abandon the Properties and grant Compass relief from stay so that it can exercise its state law remedies with respect to the Properties. Such relief would not only be welcomed by Compass, it would relieve this Court and the parties of burdensome and unnecessary litigation involving an abstract valuation of the Properties, and provide a cost effective and efficient solution for their disposition.

Simply put, the Debtors do not need Chapter 11 relief, which is strongly indicative of bad faith and supports dismissal or conversion of these Chapter 11 cases. See Marsch, 36 F.3d at 828 (dismissing Chapter 11 proceeding for bad faith when debtor had no need for Chapter 11 relief); Liberate Techs., 314 B.R. at 211 (same). "Neither the bankruptcy courts nor the creditors should be

---

[5] The Debtors may argue that liquidating through Chapter 11 will be more expedient, but any allegation by the "Debtors [that they are merely] seeking to efficiently distribute their assets cannot establish good faith." Bepco, L.P. v. 15375 Memorial Corp. (15375 Memorial Corp.), 400 B.R. 420, 428 (D. Del. 2009).

subjected to the costs and delays of a bankruptcy proceeding under such conditions." Little Creek Dev. Co., 779 F.2d at 1073.

2. **The Debtors' Chapter 11 Cases Were Commenced as a Litigation Tactic to Interfere With the State Court Guaranty Action.**

Even if the Debtors had some plausible basis to seek Chapter 11 relief, the circumstances of these cases conclusively establish that they lack good faith. The courts often find that a Chapter 11 proceeding involving a debtor with a single asset, no ongoing business to reorganize, few if any unsecured creditors, no sources of income to sustain a plan of reorganization and "essentially a two party dispute capable of prompt adjudication in state court" lacks good faith and should be dismissed or converted. St. Paul Self Storage, 185 B.R. at 582-83; see also N. Cent. Dev. Co. v. Landmark Capital Co. (In re Landmark Capital Co.), 27 B.R. 273, 279 (Bankr. D. Ariz. 1983) (dismissing Chapter 11 case for lack of good faith that involved "an apparent two-party dispute which [could] be resolved outside of the Bankruptcy Court's jurisdiction"). In such circumstances, the courts typically determine that the bankruptcy proceeding is not commenced "to effectuate a reorganization of [the debtor's] business, but [as] a litigation tactic," which is incompatible with the purposes of Chapter 11 and justifies dismissal or conversion. St. Paul Self Storage, 185 B.R. at 583.

The Debtors' Chapter 11 cases satisfy *all* of these criteria. As noted above, the Debtors each effectively have a single asset, conduct no business activities, have no unsecured creditors, no sources of income to fund a plan and the only event preceding these cases was the State Court Guaranty Action between Compass and the Guarantors. These cases involve a prototypical "two party dispute capable of prompt adjudication in state court" and were commenced not "to effectuate a reorganization of [their] business, but [as] a litigation tactic" to interfere with the State Court Guaranty Action. St. Paul Self Storage, 185 B.R. at 583; see also Landmark Capital, 27 B.R. at 279.

Notwithstanding the Debtors' efforts to drag certain aspects of the State Court Guaranty

Action into this Court, the State Court is the appropriate forum for adjudicating Compass' claims against the Guarantors and, to the extent it ever became necessary, determining the value of the Properties. "As a general rule where, as here, the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith." In re HBA East, Inc., 87 B.R 248, 259-60 (Bankr. E.D.N.Y. 1988); see also St. Paul Self Storage, 185 B.R. at 583; Monsour Med. Ctr. v. Stein (In re Monsour Med. Ctr.), 154 B.R. 201, 208 (Bankr. W.D. Pa. 1993) ("The filing of a bankruptcy petition as a tactic to litigate non-bankruptcy issues or to resolve a dispute indicates bad faith.").

### 3. **The Debtors' Chapter 11 Cases Were Commenced to Benefit the Guarantors and Reduce Their Personal Liability to Compass.**

The obligation of the Debtors to engage in valuation litigation in which they have no conceivable interest further confirms that these Chapter 11 cases were commenced for the benefit of the Guarantors. The Chapter 11 process is not intended to be manipulated to achieve objectives that are unrelated to the reorganization of the debtor or that will solely benefit non-debtor parties. Thus, the courts have found a lack of good faith warranting dismissal or conversion of a Chapter 11 proceeding when the case has been commenced primarily to protect and benefit non-debtor third parties, including guarantors. See e.g. In re North Vermont Assocs., L.P., 165 B.R. 340 (Bankr. D.D.C. 1994); see also In re Landmark Atlantic Hess Far LLC, 2011 WL 831724, at *7-*8 (Bankr. D. Md. March 3, 2001); 15375 Memorial Corp., 400 B.R. at 428; In re First Fin. Enters., Inc., 99 B.R. 751, 756 (Bankr. W.D. Tex. 1989).

The Debtors have only three real responsibilities under the Plans. First, the Debtors will abandon and convey collateral to certain secured creditors. Second, the Debtors will receive funds contributed by their equity holders and then redistribute those funds to certain secured creditors, acting act as mere conduits and disbursing agents on behalf of the equity holders. Third, even though the Properties will be abandoned to Compass, the Debtors will be obligated to litigate the

value of the Properties under the guise of determining the amount of any unsecured deficiency claims. In fact, this obligation appears to be the only significant responsibility of the Debtors under the Plans and the only purpose for these Chapter 11 Cases because the Debtors could promptly abandon their assets and redistribute equity holder contributions outside of bankruptcy.

However, the outcome of these valuation disputes would be irrelevant to the Debtors, the estates and other creditors. The amount of any unsecured deficiency claims held by Compass cannot dilute the recoveries of any other creditors because they will be entitled to receive either specific collateral or distributions that are funded by the Debtors' equity holders. Accordingly, whether Compass holds unsecured deficiency claims equal to one cent or millions of dollars, it will have no impact on the Debtors or their estates or the treatment of any other creditors. In contrast, the Guarantors will be substantially interested in the outcome of the Debtors' litigation over the value of the Properties. For example, in the event the Properties were sold - an undertaking that the Debtors and the Guarantors have conspicuously avoided - the proceeds would be applied to Compass' debt and the obligations of the Guarantors would be correspondingly reduced. The Guarantors will undoubtedly assert in the State Court Guaranty Action that any determination of the value of the Properties by this Court, coupled with the abandonment of the Properties to Compass and the injunctions in the Plans that permanently enjoin parties from "commencing or continuing any action, in any manner, in any place, that does not comply with or is inconsistent with the provisions of [the] Plan," will limit their personal liability to Compass under the Guaranties.[6]

Given these circumstances, it is apparent that the Debtors are improperly using the

---

[6] This is not a speculative concern. The Debtors have already indicated that they will attempt to convince this Court that In re Rhead, 179 B.R. 169, 175 (Bankr. D. Ariz. 1995) establishes that a transfer of the Properties to Compass "would be the functional equivalent of a foreclosure" that will reduce the personal liability of the Guarantors to Compass. The statement of the court in Rhead is dicta, and the case is inapposite because the *guarantors* had filed for bankruptcy and were seeking to estimate claims against the estate, not litigate collateral issues for the benefit of non-debtor third parties. Nevertheless, this further confirms that the Debtors commenced these bankruptcy cases to benefit the Guarantors, rather than to serve any legitimate Chapter 11 purpose.

1  Chapter 11 process to litigate valuation issues for the benefit of the Guarantors in a forum that they
2  believe is more favorable in order to limit the personal exposure of the Guarantors to Compass.
3  "On this record, [this Court should conclude] that [the] Debtors filed their petitions more to protect
4  the [Guarantors] than to serve a legitimate bankruptcy purpose" and dismiss the Debtors' Chapter
5  11 cases for lack of good faith. 15375 Memorial Corp., 400 B.R. at 428; see also North Vermont
6  Assocs., 165 B.R. 340; HBA East, 87 B.R at 256 ("Chapter 11 relief should not be available to
7  entities filing to obtain a perceived advantage in litigation with others or to provide an alternative
8  forum.").

9        The court in North Vermont Assocs., 165 B.R. 340, dismissed a Chapter 11 proceeding for
10 bad faith under virtually identical circumstances. In North Vermont Assocs., the debtor was a
11 limited partnership that held a single parcel of real property for purposes of redevelopment. 165
12 B.R. at 340-41. The property was encumbered by a mortgage and the related loan obligations were
13 guaranteed by non-debtor third parties. Id. After the debtor defaulted on the loan, the mortgage
14 holder elected to pursue the guarantors and foreclose on the property. Id. In response, the debtor
15 commenced a Chapter 11 proceeding and filed a plan proposing to transfer the property to the
16 mortgage holder in full satisfaction of its allowed secured claim, which would be determined by
17 litigating the value of the property in the bankruptcy court. Id. at 341. The plan also proposed to
18 use the valuation of the property to determine the mortgage holder's unsecured deficiency claim,
19 limiting the maximum liability of the non-debtor guarantors to the amount of such deficiency. Id.

20       Recognizing that the primary purpose of the plan was to benefit the non-debtor guarantors,
21 the mortgage holder moved to dismiss the Chapter 11 case for lack of good faith. The court granted
22 the motion, making "the ultimate finding that the plan was filed in bad faith." Id. at 341. The
23 bankruptcy court noted that the debtor had no need for Chapter 11 relief because the mortgage
24 holder - similar to Compass - had "no apparent interest in pursing a bankruptcy case against the
25 debtor" and "already [had] a right to pursue the guarantors to recover any amount that it does not
26 recover through foreclosure and there [was] no evidence that those guarantees [would] not suffice

to make it whole." Id. at 341-42. As a result, the court concluded that the purpose of the bankruptcy case was "to cushion the amount of liabilities under the guarantees," which warranted dismissal of the Chapter 11 proceeding for bad faith. Id. at 343 (citing In re Humble Place Joint Venture, 936 F.2d 814, 818 (5th Cir. 1991)).

"Where, as here, the goal of the [Debtors' bankruptcy] filing is to cushion the amount of liabilities [of the Guarantors] under the guarantees," their Chapter 11 cases lack good faith and should be dismissed or converted. Id. at 343.

### C. Dismissal or Conversion of the Debtors' Chapter 11 Cases Is In the Best Interest of Creditors.

Bankruptcy Code § 1112(b)(1) provides that once a movant establishes cause for dismissal, the court *must* dismiss the case unless there are unusual circumstances establishing that dismissal would not be in the best interest of the creditors or the estate. See § 1112(b)(1); In re Kent, 2008 WL 5047799 at *7 ("Once 'cause' has been established, the burden shifts to the non-moving party to establish whether the case falls within the § 1112(b)(2) 'unusual circumstances' exceptions to § 1112(b)(1)'s mandatory action by the Court. The Court must be able to 'specifically identify factors to establish that conversion or dismissal is not in the best interest of the creditors and the estate.'"). Bankruptcy Code § 1112(b) does not define "unusual circumstances," but "the phrase contemplates conditions that are not common in chapter 11 cases." In re Prods. Int'l Co., 395 B.R. 101, 109 (Bankr. D. Ariz. 2008).

In this case, the Debtors cannot identify any "unusual circumstances" establishing that dismissal or conversion of their Chapter 11 cases is not in the best interests of the estates or creditors. Given the terms of the Plans, the Debtors' secured creditors will receive the same or better recoveries on account of their secured claims if the Debtors' Chapter 11 cases were dismissed or converted to Chapter 7. In fact, it is likely that dismissal or conversion will actually enhance their recoveries because it will avoid the substantial administrative expenses that will accrue in connection with administering these cases, including the accrual of property taxes against the

Properties.  Moreover, dismissing or converting the Debtors' Chapter 11 cases to Chapter 7 will avoid unnecessary delay and litigation that will be burdensome to the estates and waste the resources of this Court.

### III. **CONCLUSION**.

WHEREFORE, Compass requests that the Debtors' Chapter 11 cases be dismissed or converted to Chapter 7 for cause pursuant to Bankruptcy Code § 1112(b), and that the Court grant Compass such other and further relief as is just under the facts of this case.

RESPECTFULLY SUBMITTED this 28th day of April, 2011

QUARLES & BRADY LLP
Renaissance One
Two North Central Avenue
Phoenix, AZ  85004-2391

By  /s/ James L. Ugalde
      Brian Sirower
      James L. Ugalde

Attorneys for Compass Bank

COPIES of the foregoing sent
via electronic mail this 28th day
of April, 2011, to:

Mark W. Roth, Esq.
POLSINELLI SHUGHART P.C.
One East Washington Street
CityScape Building, Suite 1200
Phoenix, AZ 85004
Attorneys for Debtor
E-mail:  mroth@polsinelli.com

OFFICE OF THE U.S. TRUSTEE
230 North First Avenue
Suite 204
Phoenix, AZ  85003
E-mail:  USTPRegion14.PX.ECF@USDOJ.GOV

Annette E. Eisner